# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3368

_____

| | | |
|---|---|---|
| Missouri Roundtable for Life, a | * | |
| Missouri Benevolent Corporation; | * | |
| Frederic N. Sauer, | * | |
| | * | |
| Appellants, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Missouri. |
| Robin Carnahan, in her individual | * | |
| capacity and as Secretary of State of | * | |
| Missouri; Susan Montee, in her | * | |
| individual capacity and as Auditor | * | |
| of the State of Missouri, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: September 20, 2011
Filed: March 15, 2012

_____

Before LOKEN, BEAM, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Taking advantage of a state created opportunity for citizen initiatives, Missouri Roundtable for Life and one of its directors, Frederic N. Sauer (Roundtable) submitted thirteen proposed constitutional amendments to the Missouri secretary of state. The statutory process requires state officers to prepare a summary statement, fiscal note summary, and fiscal note for each proposed constitutional amendment.

Roundtable alleges in this § 1983 action that the summaries prepared by the secretary of state, Robin Carnahan, and the state auditor, Susan Montee, "continuously and persistently stymied and frustrated" its intended messages in violation of its constitutional rights and Missouri statute § 116.334. After determining that Roundtable had not shown that its First Amendment or due process rights had been violated, the district court[1] granted motions to dismiss its federal claims and declined to exercise jurisdiction over its state law claims. Roundtable appeals, and we affirm.

I.

A.

Missouri permits its citizens to propose amendments to the state constitution. See Mo. Const. art. III, § 49. Chapter 116 of Title IX of Missouri's statutory code, entitled "Initiative and Referendum," outlines how citizens may submit proposed amendments, what duties state officers must complete in the process, and how any complaints may be pursued in the state courts. The same chapter gives specific duties during the initiative process to the secretary of state, the state auditor, and the attorney general. Each of these state officers are elected by voters to serve four year terms. See Mo. Const. art. IV, § 17; Mo. Rev. Stat. tit. IV, chs. 27–29.

The statutes provide that proponents of a constitutional amendment may start the amendment process by submitting to the secretary of state a "sample sheet" with the proposed form in which the petition would be circulated. Mo. Rev. Stat. § 116.332(1). Upon receipt the secretary of state must refer the sample petition sheet "to the attorney general for his approval and to the state auditor." Id. The attorney general reviews each petition sheet for sufficiency as to form and then sends it on to

_____

[1]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

the secretary of state, noting his approval or his rejection and any other comments. Id. § 116.332(1)–(2). The secretary of state then makes a "final decision as to the approval or rejection of the form of the petition" and sends written notice of that decision to the proponent "within thirty days after submission of the petition sheet." Id. § 116.332(1), (3).

If the petition form is approved, the secretary of state has ten days in which to prepare and transmit to the attorney general a summary statement of the proposal in 100 words or less. Id. § 116.334(1). The summary statement must be "in the form of a question using language neither intentionally argumentative nor likely to create prejudice either for or against the proposed measure." Id. The attorney general then has ten days to approve the "legal content and form" of the summary statement. Id.

Within twenty days of her receipt of a petition sample sheet from the secretary of state, the state auditor is required to prepare a fiscal note and a fiscal note summary for each proposed initiative. Id. § 116.175(2). She shall assess "the measure's estimated cost or savings, if any, to state or local governmental entities." Id. § 116.175(1)–(3); see id. § 116.332(1). Like the secretary of state's summary statement, the auditor's fiscal note summary must be written "in language neither argumentative nor likely to create prejudice either for or against the proposed measure." Id. § 116.175(3). It must be no longer than 50 words (articles not counted). Id.

The auditor may consult "with the state departments, local government entities, the general assembly and others with knowledge pertinent to the cost of the proposal" and may review "proposed statement[s] of fiscal impact" submitted by proponents or opponents of the initiative. Id. § 116.175(1). The fiscal note and the fiscal note summary are to be forwarded to the attorney general who must, within ten days of their receipt, approve the legal content and form of the fiscal note summary and "forward notice of such approval to the state auditor." Id. § 116.175(4).

Within three days after receiving the official summary statement and an approved fiscal note summary and fiscal note, the secretary of state is to certify an "official ballot title." Id. § 116.180. The official ballot title consists of the secretary's summary statement and the auditor's fiscal note summary in separate paragraphs, and after certification a copy must be sent to the amendment's proponent. Id. §§ 116.010(4), 116.180. The official ballot title is to be "affix[ed]" to each petition page used by circulators to obtain voter signatures in support of the proposed amendment. Id. § 116.180. The proponent's own proposed language for the amendment must also be placed on the petition page or attached to it. See id. § 116.050(1). The law thus provides that both the proponent's proposal and the summaries prepared by the state officers must be made available with each petition page used in the solicitation process. See id. §§ 116.050(1), 116.180.

A proposed constitutional amendment will only be placed on the election ballot if the proponent obtains supporting signatures from "eight percent of the legal voters in each of two-thirds of the congressional districts in the state." Mo. Const. art. III, §§ 50, 53; Mo. Rev. Stat. § 116.150. The official ballot title appears on the voting ballot, see Mo. Rev. Stat. §§ 116.010(4), 116.230(3), and at least two copies of the full text of the proponent's proposed constitutional amendment must be posted at each polling place. See id. §§ 116.010(5), 116.290(1), (3), (4).

Any citizen may challenge an official ballot title by initiating an action in state circuit court in Cole County within ten days after the official ballot title has been certified by the secretary of state. Id. § 116.190(1). The secretary of state shall be named as a defendant if the action challenges the official ballot title, and the state auditor shall be named as a defendant if it challenges the fiscal note or the fiscal note summary. Id. § 116.190(2). The petition shall state the reason or reasons why the secretary's summary statement or auditor's fiscal note or fiscal note summary is "insufficient or unfair" and shall request a different summary statement, fiscal note summary, or fiscal note. Id. § 116.190(3). Such an action is to be placed at the top

of the state court's civil docket, and an appeal to the Missouri Supreme Court is permitted within ten days after the circuit court's decision.  Id. § 116.190(4).

B.

Between March 2008 and September 2009 Roundtable submitted thirteen proposed ballot initiatives to the Missouri secretary of state.  The subject matter of the thirteen proposed amendments included such topics as "Abortion Services," "Human Cloning," and "Taxpayer Protection."  Roundtable also volunteered its own proposed summary statement for each of its amendments and requested that the secretary of state adopt those for her official summary statements.  Although the statutory scheme does not provide for such submissions to the secretary of state, it does authorize submission of a "proposed statement of fiscal impact" to the state auditor by an amendment's proponent.  Mo. Rev. Stat. § 116.175(1).  Roundtable has presented no evidence that it provided Auditor Montee with any proposed statements of fiscal impact.

Secretary of State Carnahan followed the next step in the statutory process by preparing a summary statement for each of Roundtable's proposals, as did Auditor Montee by preparing a fiscal note summary and a fiscal note for each.  As required by law, the attorney general then reviewed each summary statement, fiscal note summary, and fiscal note prepared by the state officers.  He approved each.  After this process was completed, the secretary of state certified an official ballot title for each proposal consisting of two paragraphs. One is the secretary's summary statement and the other is the auditor's fiscal note summary.

Roundtable makes a general objection to Carnahan's summary statements and Montee's fiscal note summaries and fiscal notes, but it has not shown that they contained false statements, pejorative language, or critical commentary. The amount of variation between the wording in Carnahan's summary statements and the language

-5-

volunteered by Roundtable differs, depending on the individual amendment. Several representative examples of the official ballot titles prepared by the state officers are juxtaposed in the attached Appendix with the volunteered language Roundtable preferred. The state auditor's fiscal note summaries make up the second paragraph of the official ballot title. Those summaries concluded for each of Roundtable's proposals that the "total costs [or savings] to state and local governmental entities are unknown." Roundtable has not raised any specific challenges to the wording used in the auditor's summaries.

Counsel for the state officers claims that Roundtable never circulated any of its thirteen proposed amendments in the attempt to secure signatures in support and that it withdrew all of its petitions before the 2010 elections. The record made before the district court does not show any effort to obtain the required number of signatures for them to be voted on. No evidence was produced by Roundtable to show that it ever affixed the official ballot titles to initiative petitions, attempted to obtain signatures in favor of its proposed amendments, actually obtained any signatures, or was thwarted in its attempts.

After receiving the certified official ballot titles for all thirteen proposed amendments, Roundtable brought this action under 42 U.S.C. § 1983 against Carnahan and Montee, in both their individual and official capacities. In an unverified complaint Roundtable alleges that the state officers violated its First and Fourteenth Amendment rights by intentionally modifying key language and improperly characterizing its proposed amendments to undermine its political message. Roundtable also alleges that Carnahan violated Missouri statute § 116.334, alone and by conspiring with Montee. Roundtable attached as exhibits to its complaint certain documents, including certified official ballot titles and its own proposed summary statements. It never submitted any affidavits to show that it ever affixed the official ballot title to a petition, attempted to gain signatures supporting its proposals, or encountered any citizen confusion.

-6-

In its complaint Roundtable seeks declaratory and injunctive relief forbidding the state officers "from doing in the future that which they have been alleged to have done [in the complaint]," an injunction "forbidding [use of] any and all" summary statements, fiscal note summaries, and fiscal notes drafted by state officers for Roundtable's thirteen proposed amendments unless approved in advance by a federal court, and actual, compensatory, nominal, and punitive damages, as well as costs and attorney fees.

At the time Roundtable filed this action in the federal district court, it may have already initiated multiple state court actions under Missouri statute § 116.190 to challenge at least some of the official ballot titles referenced here. The district court noted that the record did not reflect the details or dispositions of those cases. Counsel for the state officers has indicated that Roundtable never obtained final judgments in any of them, but that one of Carnahan's summary statements was apparently approved by a circuit court. The brief for the state officers states that while Roundtable's proposed initiatives may have led to litigation, "in most cases it had been dismissed or the initiative petition withdrawn." Roundtable has not shown whether it filed challenges in state court against any of the official ballot titles which it challenges here.

The district court granted motions by the state officers to dismiss Roundtable's claims with prejudice, after concluding that Roundtable had failed to state a First Amendment claim, that it could not assert a procedural due process claim because the state had provided constitutionally adequate process under Missouri statute § 116.190, and that it lacked standing to raise a substantive due process claim. After dismissing all of Roundtable's federal claims, the district court declined to exercise jurisdiction over its state law claims.

Roundtable challenges the district court's dismissal of its claims under the First and Fourteenth Amendments, as well as the dismissal of its state law claims. We

review the dismissal of the constitutional claims de novo, accepting the facts alleged in the complaint as true and making all reasonable inferences in favor of Roundtable. See Mulvenon v. Greenwood, 643 F.3d 653, 656–57 (8th Cir. 2011).

II.

A.

A threshold question is whether Roundtable has standing to raise a First Amendment challenge to the official ballot titles prepared by the secretary of state and auditor. Although the official ballot titles would have appeared on the election ballot if Roundtable had procured signatures from the number of legal voters required by Missouri law for constitutional amendments (8% in each of two thirds of the state's congressional districts), these documents did not restrict Roundtable's own speech in support of its proposals. Roundtable remained free to use its preferred wording for its proposals in soliciting voter signatures to place the amendments on the election ballot. And according to Missouri law Roundtable's own wording for its proposed amendment must be placed on each petition page used to obtain voter signatures or attached to it. Mo. Rev. Stat. § 116.050(1). While Missouri law provides any dissatisfied proponent an opportunity for redress in the state courts, Roundtable has not stated whether it ever completed that process.

A party invoking federal jurisdiction must show a right to assert a claim in federal court by showing injury in fact, causation, and redressability. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992). The Supreme Court has explained that the injury in fact requirement means showing "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Id. at 560 (citations and quotation omitted). A party cannot show an injury in fact by mere "[a]llegations of possible future injury." Whitmore v. Arkansas, 495 U.S. 149, 158 (1990). While a party need not "expose

-8-

himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights," Steffel v. Thompson, 415 U.S. 452, 459 (1974), he must show that his injury is more than "imaginary or speculative." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979) (citation omitted).

Roundtable has not clearly articulated how it has suffered any invasion of a legally protected interest or how it has been injured by the official ballot titles prepared by the state officers. Roundtable's conclusory complaint accuses the secretary of state and auditor of "draft[ing] and issu[ing]" summary statements "designed to negatively affect voters' perceptions of and reactions to the proposed amendment[s]." It alleges that it has been "continuously and persistently stymied and frustrated" and that it "cannot reasonably proceed to exercise [its] rights under the law to present initiative petitions before Missouri voters, because of the [state officers'] actions and . . . pattern of conduct."

Roundtable attached as exhibits to its unverified complaint several documents including blank petition sheets, its own volunteered summary statements, and ballot titles prepared by the state officers. Its attachments did not include any documents to show that subsequent to the certification of the official ballot title Roundtable ever took advantage of the opportunity to circulate its proposals in order to obtain voter signatures to place its initiatives on the ballot. There are no allegations or showing that Roundtable ever affixed any official ballot title to petitions or that it ever attempted to obtain signatures in favor of its proposals. Nor has it shown that anyone misunderstood its intended message because of the official ballot titles or that citizens would only look at the official ballot titles when deciding whether to support a proposal. Roundtable offered no showing that the summaries prepared by the state officers prevented it from obtaining signatures in support of its proposals.

A party can show a cognizable injury by showing that its First Amendment rights have been chilled by harm to reputation or threat of criminal prosecution. See Babbitt, 442 U.S. at 298; Meese v. Keene, 481 U.S. 465, 473 (1987). For example, a California state senator showed a cognizable chilling of his First Amendment rights in Meese by producing affidavits to establish how he would be harmed by a federal statute requiring films he wanted to show to be labeled as political propaganda. 481 U.S. at 473–77. And initiative proponents established standing in 281 Care Committee v. Arneson, 638 F.3d 621, 627–31 (8th Cir. 2011), by showing a credible threat of prosecution for knowingly or recklessly making false statements about a proposed ballot initiative. In contrast, Roundtable has made no showing that it faced harm to its reputation or criminal prosecution.

Even if Roundtable's alleged harm were characterized as a chilling of its speech, that would be insufficient to confer standing because it has not shown any concrete or particularized injury to its ability to speak. In Laird v. Tatum, 408 U.S. 1, 2 (1972), plaintiffs claimed they had been chilled from exercising their speech rights out of fear that an Army program gathering information about domestic political activities might harm them at some future date. The Supreme Court rejected their First Amendment claim, for their allegation of a "subjective chill [was] not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." Id. at 13–14 (internal quotations omitted). That is also the case here where Roundtable simply makes the conclusory allegation that it "cannot reasonably proceed to exercise [its] rights under the law to present initiative petitions before Missouri voters" without allegations or evidence that it ever tried to obtain signatures in support of its proposals, that it was ever prevented from circulating petitions, that the official ballot titles confused or misled voters, or that any voters were unable or unwilling to consider Roundtable's proposals.

While Roundtable prefers its own speech to that the secretary of state and the state auditor used while carrying out their statutory duties, it has not shown any

concrete and particularized "legally protected interest" in controlling their official speech. Lujan, 504 U.S. at 560. Missouri has chosen to give the secretary of state and the auditor obligations to prepare official summaries of citizen proposals for constitutional amendments. The legislature could have reasonably believed that these officials would have more familiarity with existing laws and how citizen proposals might fit into the statutory scheme. Roundtable has not shown that it has a legally protected interest in controlling the manner in which the state officers carry out their duties. Since Roundtable is free both to use its own description of its proposed amendments in seeking ballot support for them and to point out its objections to the official ballot titles, its speech has not been suppressed.

We have required parties to establish First Amendment injury in fact through factual allegations setting out a concrete and particularized injury. In Zanders v. Swanson, 573 F.3d 591, 594 (8th Cir. 2009), we concluded that the appellants lacked standing to challenge a state statute that made it a crime knowingly to make a false report of police misconduct, for they had presented only conclusory allegations that they could face criminal sanctions. The alleged chilling of their speech was not "objectively reasonable" because their factual allegations showed only a possible or potential injury. Id. Similarly, the plaintiffs in Elend v. Basham, 471 F.3d 1199, 1202–09 (11th Cir. 2006), lacked standing to seek declaratory and injunctive relief prohibiting the secret service from establishing protest zones at some future political protest because "the requested relief concern[ed] wholly prospective conduct for which the details of time, location, audience, and nature of the protest activity [were] utterly lacking."

In challenges to state initiative laws, plaintiffs typically show injury in fact through affidavits, whether as verified statements attached to the complaint or sworn statements submitted later. In Initiative & Referendum Institute v. Walker, 450 F.3d 1082, 1085 (10th Cir. 2006) (en banc), citizen groups challenged a Utah law requiring wildlife management initiatives to obtain approval of two thirds of those voting instead of the simple majority normally required. The plaintiffs argued that this

-11-

requirement imposed a "chilling effect" on the exercise of their First Amendment rights. Id. They submitted affidavits showing they had previously participated in wildlife initiative campaigns in other western states, had a long history of wildlife advocacy, had been seriously considering mounting a wildlife initiative campaign in Utah, but had chosen not to proceed solely because of the two thirds majority requirement. Id. at 1090–92. The proponents had thus shown more than a "subjective chill" of their First Amendment rights. Id. at 1090 (citation and quotation omitted).

Here, Roundtable has not provided any factual allegations to show that it has suffered a concrete and particularized injury. Roundtable has not alleged that the summaries prepared by state officers prevented it from circulating its proposed amendments. It has failed to show that it ever affixed the official ballot titles to its petitions, attempted to obtain signatures in their favor, or received any negative feedback from potential signatories because of the official ballot titles. It has also not shown that it ever completed the process provided under Missouri statute § 116.190 to attempt to modify the language in the official ballot titles before circulation. Nothing concrete has been offered to show that the official ballot titles would have actually impaired its ability to obtain signatures in support of its proposed amendments. Since Roundtable remained free to use its own speech in support of its proposals and in criticism of the official ballot titles, it has failed to show any objectively reasonable chilling of its speech. It therefore lacks standing to raise its First Amendment challenges.

Standing and ripeness are sometimes closely related. Johnson v. Missouri, 142 F.3d 1087, 1090 n.4 (8th Cir. 1998). In assessing ripeness, we focus on whether the case involves "contingent future events that may not occur as anticipated, or indeed may not occur at all," 281 Care Committee, 638 F.3d at 631 (citation omitted), and we examine "important prudential limitations" that may "require us to stay our hand until the issues in [the] case have become more fully developed." Morgan v. McCotter, 365 F.3d 882, 890 (10th Cir. 2004). Roundtable's complaint only alleges

that the secretary of state and auditor prepared summaries which it believes are misleading. It has not shown in the record before the court that it ever attempted to obtain support for its proposed amendments by circulating petitions including the official ballot titles, that it obtained any negative voter responses, or that it ever completed the process to try to modify them in the state courts. Without a specific showing of harm to Roundtable, its action involves uncertain or contingent future events not yet ripe for judicial review.

B.

The district court dismissed Roundtable's First Amendment claims on the merits, citing Dobrovolny v. Moore, 126 F.3d 1111, 1113 (8th Cir. 1997), a case in which we stated that "the right to a state initiative process is not a right guaranteed by the United States Constitution." Roundtable contends that the district court erred in dismissing its claims because its First Amendment rights were violated even though Missouri's initiative process is not guaranteed by the Constitution. It argues that the state officers intentionally and materially altered its "core political speech," citing Buckley v. American Constitutional Law Foundation, Inc., 525 U.S. 182, 186 (1999). Also relying on Meyer v. Grant, 486 U.S. 414 (1988), Roundtable requests that the official summary statements be reviewed under "strict scrutiny." The state officers respond that their summaries did not implicate Roundtable's First Amendment rights because they were prepared as part of a state created initiative process. They also suggest that a balancing test would be the appropriate standard to employ if the court were to conclude that First Amendment injury had been shown, citing Campbell v. Buckley, 203 F.3d 738 (10th Cir. 2000) (initiative procedures upheld under balancing test). Neither side on appeal addressed Roundtable's standing to raise its First Amendment claims, but both fully briefed the other constitutional issues. We review their arguments.

In Meyer, the Supreme Court examined a Colorado law imposing criminal penalties for paying or receiving money to circulate initiative petitions. 486 U.S. at

-13-

416 n.1. That law restricted political speech by limiting "the number of voices" who could spread a proponent's message, making it less likely to "garner the number of signatures necessary to place the matter on the ballot." Id. at 422–23. Since this affected "core political speech," the Court applied "exacting scrutiny" and invalidated the law. Id. at 420–22. Similarly, the statutes found unconstitutional in Buckley required petition circulators to be registered voters and to wear identification badges. 525 U.S. at 192–200. They also required initiative proponents to report any payments made to circulators. Id. at 201–04. The Court invalidated these statutes for decreasing the available speech by "drastically reduc[ing]" the number of people willing to promote an amendment, "discourag[ing] participation" in the petition circulation process, and even forcing paid circulators "to surrender [their] anonymity." Id. at 193, 200, 204 (citation and quotation omitted).

Roundtable has failed to show how its asserted right to control the speech used by elected state officers in response to citizen initiative proposals for constitutional amendments would be subject to the exacting scrutiny test used in Meyer and Buckley. Both of those cases involved laws that limited the number of people who would be willing to circulate petitions, discouraged participation in an initiative campaign, and inevitably reduced the amount of speech available to proponents. Where no restriction on speech has been shown, courts have refused to apply exacting scrutiny. For example, strict scrutiny was "inapplicable" in Biddulph v. Mortham, 89 F.3d 1491, 1498 (11th Cir. 1996), because the initiative proponent there had not shown that a challenged Florida voting law restricted political discussion. That law permitted the Florida Supreme Court to reject a proposed amendment for ambiguity or for violation of a "single-subject requirement" even after a proponent had obtained the necessary signatures to place it on the ballot. Id. at 1494. The proponent argued that the Florida law violated the First Amendment by deterring him from proposing ballot initiatives, but the court concluded that he had failed to make out a viable claim because the law in question did not "burden[] the exchange of ideas." Id. at 1500–01. It also commented that "[m]ost restrictions a state might impose on its initiative process would not implicate First Amendment concerns." Id. at 1500.

Like the Florida law in <u>Biddulph</u>, the Missouri ballot initiative law challenged by Roundtable does not limit the exchange of ideas during the petition circulation process. Missouri's requirement that state officers prepare summary statements for proposed amendments does not limit the number of people who can circulate petitions in favor of a proposed amendment, restrict the speech they use in doing so, or regulate how many others they may approach in an attempt to garner support. The summaries prepared by the state officers do not purport to be Roundtable's speech. Roundtable can ask its circulators to express disagreement with the summaries prepared by elected state officers, can affix its own volunteered summaries to the petitions it circulates, and can prepare a written message explaining the ways that it believes the state officers' summaries are misleading or deficient.

Our own circuit precedent is not only illustrative, but governing. In <u>Dobrovolny</u>, 126 F.3d at 1112, we determined that Nebraska's constitutional requirement that initiative proponents obtain signatures from 10% of the state's registered voters on a particular date was not subject to <u>Meyer</u>'s exacting scrutiny and did not violate the First Amendment. That Nebraska vote requirement "in no way restricted [the] ability [of proponents] to circulate petitions or otherwise engage in political speech." <u>Id.</u> That is also the situation in the case now before our court. We similarly concluded in <u>Wellwood v. Johnson</u>, 172 F.3d 1007, 1008–09 (8th Cir. 1999), that an Arkansas law requiring a larger number of signatures to place initiatives on the ballot for laws that would change a county from "wet" to "dry" or vice versa did not violate the First Amendment because it "in no way" prevented proponents' views from being heard. That law was also not subject to strict scrutiny and did not violate the First Amendment because it did not decrease the speech available to initiative proponents. <u>Id.</u> at 1009.

The Tenth Circuit's decision in <u>Walker</u>, 450 F.3d at 1099–1101, is also instructive. There, Judge McConnell, writing for the en banc majority, proceeded by analyzing first whether the First Amendment was even implicated by Utah's wildlife initiative requirement. <u>Id.</u> at 1099. He concluded it was not. <u>Id.</u> at 1101. That was

-15-

because proponents were not restricted in their ability to publicize their views and the law did not regulate the advocacy process itself or limit the "communicative conduct of persons advocating a position." Id. at 1100–01. There was thus no need to mention the circuit's prior Campbell case which had applied a balancing test even without analyzing whether a First Amendment issue had been shown. The situation in the case before our court is similar to Walker because Roundtable has not been prevented by Missouri law from using its own speech, including its proposed summaries and the full text of its proposals, in its attempts to obtain the required number of signatures for its proposed amendments to be placed on the ballot.

Roundtable has in fact not shown any restriction on its ability to circulate petitions or otherwise engage in political speech. See Walker, 450 F.3d at 1100; Dobrovolny, 126 F.3d at 1112. Nor has it shown any burden on its ability to publicize its own views or to use its preferred language while collecting signatures. See Wellwood, 172 F.3d at 1009. Roundtable's own wording of its proposed amendments must be affixed or attached to all petitions for potential signatories to view and would also be required to be available at all polling places if any of the amendments were ever placed on the ballot.[2] Moreover, if Roundtable believed that the summary statements prepared by state officers were unfair or misleading, it could have completed a challenge against them in state court as provided under Missouri statute § 116.190. It could also have informed potential signatories that it disagreed with the official ballot titles and used that fact in the next election cycle to attempt to gain additional support for its proposals. Since Roundtable has not shown that it has been limited in its ability to speak, it has not made out any First Amendment claim.

---

[2]Since Roundtable apparently never completed the circulation process for its constitutional initiatives, it is unclear what First Amendment issues might have materialized if it had succeeded in placing its proposed amendments on the ballot.

III.

Roundtable also claims violation of its due process rights. The district court assumed that Missouri's initiative procedure created a protected liberty interest, but concluded that Roundtable could not assert a procedural due process claim because it had not alleged "that the procedures afforded [to it] by Missouri law were inadequate." It further concluded that Roundtable lacked standing to assert a substantive due process claim because it was bringing nothing more than a generalized grievance available to all voters.

A procedural due process claim requires showing a deprivation of a protected life, liberty, or property interest "without due process of law." Parratt v. Taylor, 451 U.S. 527, 537 (1981) (citation omitted), overruled on other grounds by Daniels v. Williams, 474 U.S. 327, 330–31 (1986). Whether a constitutional violation has occurred depends in part on "what process the State provided, and whether it was constitutionally adequate." Zinermon v. Burch, 494 U.S. 113, 126 (1990). Even assuming that Roundtable sufficiently asserted a liberty interest in Missouri's initiative procedures, it has failed to state a procedural due process claim because no party has established the state's review procedures to be inadequate or unconstitutional. Missouri statute § 116.190 allows Roundtable or any other citizen to challenge an official ballot title or fiscal note that may be perceived to be insufficient or unfair. Any such challenge is to be placed at the top of the civil docket, and review by the Missouri Supreme Court is permitted.

The availability of a judicial hearing has been considered adequate process, for the "right to a judicial hearing is the classic protection provided by the Due Process Clause against arbitrary deprivations of life, liberty, or property." Larson v. City of Fergus Falls, 229 F.3d 692, 697 (8th Cir. 2000); see also Rivera-Powell v. New York City Bd. of Elections, 470 F.3d 458, 467–68 (2d Cir. 2006) (expedited review of election issue in state court found to be important factor in determining no procedural

-17-

due process violation). In its statutes Missouri provides a constitutionally adequate process in which a party can be heard expeditiously and seek appellate review.

Roundtable was clearly aware of the procedures under Missouri statute § 116.190 because the district court noted that it had filed "multiple . . . suits" in state court to challenge the official ballot titles prepared by Carnahan and Montee. It has not shown whether it fully pursued these claims, however. Roundtable's claims in federal court focus on the adequacy of the official ballot titles, not on "whether the State . . . [provided] constitutionally adequate procedures." Parrish v. Mallinger, 133 F.3d 612, 615 (8th Cir. 1998).

Roundtable also alleges that its substantive due process rights have been violated because the official ballot titles prepared by state officers distorted their messages in such a manner that voters would have been fundamentally misled. A substantive due process claim requires a showing that "a fundamental right was violated and that the conduct shocks the conscience." Akins v. Epperly, 588 F.3d 1178, 1183 (8th Cir. 2009) (footnote omitted). Roundtable has not shown any conduct that shocks the conscience. Not only did it not allege that it ever affixed any official ballot titles to petition sheets to solicit signatures or that any voter was misled by the state officers' summaries, but Missouri requires that the full text of a proponent's proposed amendment be available with petition sheets and at the polling places during voting. Burton v. Georgia, 953 F.2d 1266, 1269 (11th Cir. 1992) (footnote omitted) ("As long as citizens are afforded reasonable opportunity to examine the full text of the proposed amendment, broad-gauged unfairness is avoided if the ballot language identifies for the voter the amendment to be voted upon.").

The district court did not err in dismissing Roundtable's due process claims.

## IV.

Finally, Roundtable challenges the district court's refusal to exercise supplemental jurisdiction over its state law claims after dismissing its § 1983 claims. Our review of a decision not to exercise supplemental jurisdiction over state law claims is for abuse of discretion. Glorvigen v. Cirrus Design Corp., 581 F.3d 737, 743 (8th Cir. 2009). The Supreme Court has explained that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988). That is also true in this case. Roundtable has not shown that the district court abused its discretion by dismissing its state law claims so that they may be considered by the Missouri courts.

## V.

For these reasons we affirm the judgment of the district court.

_____

_____

| Abortion Services Amendment | |
|---|---|
| Official Ballot Title | Shall the Missouri Constitution be amended to make it illegal for the legislature or state or local governments to expend, pay, or grant public funds to hospitals or other institutions for abortion services, as defined by the general assembly in section 196.1127, Revised Statutes of Missouri 2003, including those necessary to save the life of the mother?<br><br>This proposal could jeopardize federal grants to state and local governmental entities for medical assistance programs. The total costs to state and local governmental entities are unknown. |
| Roundtable's volunteered summary statement | Shall the Missouri Constitution be amended to make it unlawful to expend, pay, or grant any public funds for abortion services, as such term was defined by the Missouri general assembly in 2003?* |

* Roundtable apparently did not volunteer any fiscal note summaries of its own. (The state auditor's fiscal note summary makes up the second paragraph of the official ballot title while the first paragraph is the summary prepared by the secretary of state.)

| Human Cloning Amendment | |
|---|---|
| Official Ballot Title | Shall the Missouri Constitution be amended to make it illegal for the legislature or state or local governments to expend, pay, or grant public funds to hospitals or other institutions for certain types of stem cell research currently allowed under Missouri law?<br><br>This proposal could have a significant negative fiscal impact on state and local governmental entities. Federal grants to state governmental entities for research programs may be in jeopardy. The total costs to state and local governmental entities are unknown. |
| Roundtable's volunteered summary statement | Shall the Missouri Constitution be amended to make it unlawful to expend, pay, or grant any public funds for human cloning, as such term was defined by the Missouri general assembly in 2003?* |

| Taxpayer Protection Amendment | |
|---|---|
| Official Ballot Title | Shall the Missouri Constitution be amended to make it illegal for the legislature or state or local governments to expend, pay, or grant public funds to hospitals or other institutions for certain research and services, as defined by the general assembly in section 196.1127, Revised Statutes of Missouri, 2003, such as abortion services, including those necessary to save the life of the mother, and certain types of stem cell research currently allowed under Missouri law?<br><br>This proposal could have a significant negative fiscal impact on state and local governmental entities by prohibiting the use of public funds for certain research activities. Federal grants to state governmental entities for research and medical assistance programs may be in jeopardy. The total costs to state and local governmental entities are unknown. |
| Roundtable's volunteered summary statement | Shall the Missouri Constitution be amended to make it unlawful to expend, pay, or grant any public funds for abortion services, human cloning, or prohibited human research, as such terms were defined by the Missouri general assembly in 2003?* |

_____