NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0437n.06
Case No. 24-1985

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Sep 25, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| REPUBLICAN NATIONAL COMMITTEE, et al., | ) ) ) |  |
| Plaintiffs-Appellants, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| v. | ) ) ) |  |
| JOCELYN BENSON, in her official capacity as Michigan Secretary of State, et al., | ) ) |  |
| Defendants-Appellees. | ) ) | OPINION |

Before: SUTTON, Chief Judge; GIBBONS and WHITE, Circuit Judges.

PER CURIAM. The Republican National Committee alleges that Michigan's failure to remove ineligible individuals from its voter rolls violates the National Voter Registration Act. The district court dismissed its claims for lack of standing. We agree.

I.

As relevant to today's case, the National Voter Registration Act requires each State to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters," such as those who have left the State. 52 U.S.C. § 20507(a)(4). At the same time, the Act imposes several procedural hurdles that States must satisfy before removing registered voters. *See id.* § 20507(d)(1). "A person who is aggrieved by a violation" may sue state officials for declaratory or injunctive relief so long as they provide "written notice of the violation to the chief

election official of the State involved" and give the official an opportunity to fix the problem. *Id.* § 20510(b)(1)–(2). If the violation occurs within 30 days of a federal election, an aggrieved person may sue without providing notice to the State. *Id.* § 20510(b)(3).

In March 2024, the Republican National Committee (the RNC for short) sued Michigan Secretary of State Jocelyn Benson and Bureau of Elections Director Jonathan Brater seeking declaratory and injunctive relief under the Act. It alleged that the officials did not make a "reasonable effort to remove" ineligible nonresidents from the voter rolls. R.1 at 10–17. It based this claim mainly on the apparent oddity that, in most Michigan counties, the number of active registered voters exceeds the voting-age population. The state officials responded by challenging the RNC's calculations and explaining that the delay in removing voters from the rolls arose from their efforts to comply with the Act's procedural restraints.

The state officials moved to dismiss the lawsuit, arguing that the RNC lacked standing under Rule 12(b)(1) of the Federal Rules of Civil Procedure. The district court agreed and dismissed the lawsuit for lack of standing.

## II.

Article III of the United States Constitution limits the "judicial Power" of the federal courts by permitting them to decide only "Cases" or "Controversies." U.S. Const. art. III, § 2. A "Case" or "Controversy" exists if a plaintiff has a "personal stake" in the case, what we have come to call standing to bring a claim. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (quotation omitted). Standing has three elements: (1) an actual injury (2) caused by the defendants (3) that a favorable decision would redress. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). These same principles apply to organizational standing, in which an organization "sue[s] on [its] own behalf for injuries [it] ha[s] sustained." *All. for Hippocratic Med.*, 602 U.S. at 393–94 (quotation

omitted). The RNC, as the claimant, bears the burden of establishing standing to bring this claim. *Lujan*, 504 U.S. at 561.

In this injunction action, we need not go beyond injury. Monetary losses often count as traditional injuries. But there is a difference between past and future losses of money. While a direct monetary loss from the implementation of a law readily suffices in the context of a backward-looking money-damages claim, the same is not true for forward-looking injunction actions. In the injunction setting, the claimant must plead an "imminent" loss, one that is "certainly impending." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

### III.

In its complaint, the RNC raises two theories of organizational standing. It asserts that these inaccurate lists cause voter fraud, harming its ability to elect Republicans. And it asserts that it relies on the registered-voters lists to determine its allocation of resources and that Michigan's inaccurate lists may cause it to waste money on efforts to reach ineligible voters and on efforts to investigate the officials' list-maintenance failures. Perhaps recognizing the weakness of its fraud argument, the RNC does not advance it on appeal in any significant way, and we need not address it. *Kuhn v. Washtenaw County*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived.").

The RNC's diversion-of-resources theory fails to satisfy the imminence requirements of Article III and is unduly speculative. The reason turns on the language of the complaint. The RNC alleges that, in responding to the Michigan election officials' actions, it "*may* spend more on resources," and "*may* misallocate its scarce resources" if voter registration lists "include names of

voters who should no longer be on the list." R.1 at 4 (emphases added). The RNC's allegations of past economic injury—like expenditures of "time and resources," R.1 at 5, 6—are conclusory and the complaint fails to link them to "certainly impending" or imminent future harm. *Driehaus*, 573 U.S. at 158 (quotation omitted). The complaint-driven uncertainty over whether the RNC's expenditures will change in light of the officials' actions does not satisfy the "*certainly impending*" requirement for stating a constitutional injury. *See Clapper*, 568 U.S. at 409 ("'[A]llegations of *possible* future injury' are not sufficient." (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990))).

We have rejected similar claims before in the context of similar challenges to state officials' obligations under the Act. In *Public Interest Legal Foundation v. Benson*, we rejected a nonprofit organization's lawsuit—under the same Act, against the same Secretary of State, about access to the same records—because the purported harms to its "research, educational, and remedial activities" were unduly speculative. 136 F.4th 613, 631–32 (6th Cir. 2025). The organization had failed to identify any "specific projects, research papers, or educational outreach efforts that were directly impacted by Secretary Benson's failure to produce relevant records." *Id.* at 631. Although that case was at the summary-judgment stage, a similar conclusion applies here because the RNC has failed even to *plead* specific, certainly impending injuries.

In resisting this conclusion, the RNC argues that the officials' improper list management damages its "core organizational mission," Appellant's Br. 16–17, and claims that such an injury suffices for standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). *Havens*, we appreciate, permitted a housing counseling organization to sue the owner of an apartment complex under the Fair Housing Act. *Id.* at 368, 378–79. The organization was "not only" an "issue advocacy organization," the Court reasoned, but it "also operated a housing counseling service."

*All. for Hippocratic Med.*, 602 U.S. at 395. And it collected money to operate that service. When an apartment complex lied to one of the organization's employees about housing availability, it suffered concrete damages, giving it a cognizable injury to stand on. *Id.*

The RNC's reliance on *Havens Realty* is flawed, however, because the RNC's alleged injury is more indirect than the one in *Havens Realty*, as it identifies speculative costs that the RNC "may" or may not incur. R.1 at 4. To be sure, the second-to-last sentence on the final page of the complaint states that "Plaintiffs will be injured by Defendants' violations of the NVRA until the Defendants are enjoined from violating the law." R.1 at 20. But this summary of the RNC's claim amounts to a conclusory allegation that the RNC "will continue to be injured." R.1 at 20; *see Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury . . . may suffice," but a mere assertion of legal "injury" does not.). If the RNC's injury turns solely on the possibility of incurring expenses, the claim that it "will continue" to be injured means only that "it will continue" to "may[be] spend more" or "may[be] misallocate its scarce resources." R.1 at 4, 20. The RNC's allegations of such a "conjectural [and] hypothetical" injury fall short of the pleadings required by Article III. *See Driehaus*, 573 U.S. at 158 (quotation omitted).

The RNC's allegations of prior economic injury face similar headwinds. Its complaint describes organizational expenditures because of the defendants' alleged noncompliance, but only vaguely refers to spending "time and resources," and suffering "economic, financial, and political injury" while misallocating "scarce resources." R.1 at 5, 6, 19. These allegations are too conclusory to constitute injury in fact, even under the lighter standard to establish standing at the pleading stage. *See Driehaus*, 573 U.S. at 158; *Lujan*, 504 U.S. at 561.

These allegations also fail to establish injury in the injunction context. Regardless of whether *Havens* and *Hippocratic Medicine* provide a pathway to standing for the RNC, its "generic

5

allegations of past harm can serve only as 'a launching pad for a showing of imminent future injury.'" *Tenn. Conf. of the NAACP v. Lee*, 139 F.4th 557, 567 (6th Cir. 2025) (quoting *Murthy v. Missouri*, 603 U.S. 43, 59 (2024)). But RNC fails to show how its allegations of prior injury or other past exposure to economic harms from the defendants led to "imminent . . . future injury." *Clapper*, 568 U.S. at 409 (quotation omitted); *see also Lee*, 139 F.4th at 567. All the RNC alleges regarding future harm is the possibility of misallocated resources that "may" occur. R.1 at 4. That fails to sufficiently plead "a real and immediate threat of repeated injury." *Lee*, 139 F.4th at 567 (quoting *Murthy*, 603 U.S. at 58).

IV.

The RNC separately argues that the district court abused its discretion by failing to give it a chance to amend its complaint after that court's order dismissing its case. No abuse of discretion occurred. Leave to amend a complaint, it is true, is generally given freely. Fed. R. Civ. P. 15(a); *see Foman v. Davis*, 371 U.S. 178, 182 (1962). But a district court does not abuse its discretion in denying a request to amend when, as here, the plaintiff had "an opportunity to amend of which [it] failed to take advantage." *Mellentine v. Ameriquest Mortg. Co.*, 515 F. App'x 419, 425 (6th Cir. 2013).

The RNC at all events will not suffer any prejudice from the district court's decision. It dismissed the case under Civil Rule 12(b)(1) for lack of subject matter jurisdiction. Such dismissals, by definition, are without prejudice, permitting the RNC to refile its complaint. *Bowles v. Whitmer*, 120 F.4th 1304, 1312 (6th Cir. 2024).

We affirm.

6